O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA EXPANDED METAL PRODUCTS COMPANY, ET AL., <br><br> Plaintiff, <br><br> v. <br><br> JAMES A. KLEIN, ET AL., <br><br> Defendants. | Case No. CV 16-05968 DDP (MRWx) <br><br> **ORDER RE: PRELIMINARY INJUNCTION** |

This matter comes before the court on the court's Order to Show Cause Re: Preliminary Injunction. Having considered the submissions of the parties and heard oral argument, the court enters a preliminary injunction against Defendants and adopts the following Order.

**I. Background**

The history of this case is well known to the parties and described in detail in this Court's prior Orders. In brief, Defendant James Klein ("Klein") assigned various building material-related patents to a company he helped form, Defendant Blazeframe Industries, Ltd. ("Blazeframe"). Klein, Blazeframe, and Plaintiffs

California Expanded Metal Products Company ("CEMCO") and ClarkWestern Dietrich Building Systems LLC ("Clark") litigated several questions regarding the ownership, licensing, and alleged infringement of the patents in a prior case before this court. See No. CV 12-10791-DDP(MRWx) ("the prior case").

The parties settled all claims in the prior case. The transcript of a settlement conference constitutes the Settlement Agreement.[1] Blazeframe agreed to transfer the patents to CEMCO, which would then license the patents to Clark and to Blazeframe. Among the material provisions of the Settlement Agreement were terms related to ownership and maintenance of safety certifications, or listings, issued by nonparty Underwriters Laboratories ("UL"). Many architects and contractors will not utilize products that are not UL-approved. At the settlement conference, Clark's counsel asked whether "CEMCO will be maintaining all the UL files . . . ." Blazeframe's counsel responded, "No." Clark's counsel then said, "Let me ask it a different way. There will be a provision that all the UL files will be maintained – and – by someone, so – such that Clark Dietrich will have the benefit of them as it currently does." Blazerframe's counsel replied, "I think that's correct." Clark's counsel clarified that she was "actually talking about the[] UL approvals that are related to the products." Blazeframe's counsel then stated, "Yes, that's correct. Those are not being transferred

---

[1] The parties agreed to the terms of a settlement at the settlement conference and further agreed that if they failed to agree on a memorialization of those terms, the transcript of the settlement conference would constitute the Settlement Agreement.

2

and neither is the trademark, but yes, that's all going to be maintained."

In the instant case, Plaintiffs allege that Defendants breached the Settlement Agreement and infringed upon the patents. On February 3, 2017, Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order, asserting that Blazeframe had threatened to drop Clark from the UL listings for the licensed products. (Dkt. 53.) At hearing, Defendants agreed to take no further action to de-list Clark, and represented that they would do everything in their power to ensure that Clark either remained listed on the UL certifications or, in the event UL had already de-listed Clark, to reinstate Clark's UL listings. On the basis of that representation, the court vacated Plaintiffs' application for a TRO. (Dkt. 63.)

Shortly after the February 7 hearing, UL revealed new testing standards, and indicated that the licensed products at issue here will need to demonstrate compliance with the new standards by August 2017. UL further required that listing entities submit new testing plans to UL no later than May 31, 2017. Plaintiffs assert that the parties were aware of impending changes to UL's testing requirements prior to the October 2015 settlement conference that resulted in the Settlement Agreement.

On May 5, 2017, Plaintiffs filed another Application for A Temporary Restraining Order. (Dkt. 100.) Plaintiffs contended that, despite the representations made at the February 7 TRO hearing, Defendants were once again threatening to "dump" Clark from the UL listings. Indeed, Defendants' counsel represented to Plaintiffs that that "Blazeframe has no duties to ClarkDietrich

3

whatsover." (Declaration of Anne G. Schoen in Support of TRO, Ex. 5.) Defendants did not oppose Plaintiffs' application. On May 9, 2017, this Court entered a Temporary Restraining Order enjoining Defendants from taking, or failing to take, any action that would result in Clark's removal from any UL listing and requiring Defendants to mitigate the effects of any such actions that had already been taken. The court also ordered Defendants to show cause why a preliminary injunction along similar lines should not be entered. Defendants submitted a written opposition to the entry of a preliminary injunction and all parties appeared before the court on May 22, 2017.

**II. Legal Standard**

A private party seeking a preliminary injunction must show that: (i) it is likely to succeed on the merits; (ii) it will suffer irreparable harm in the absence of preliminary relief; (iii) the balancing of the hardships and equities between the parties that would result from the issuance or denial of the injunction tips in its favor; and (iv) an injunction will be in the public interest. Winter v. Natural Res. Defense Counsel, 555 U.S. 7, 20 (2008). Preliminary relief may be warranted where a party: (i) shows a combination of probable success on the merits and the possibility of irreparable harm; or (ii) raises serious questions on such matters and shows that the balance of hardships tips in favor of an injunction. See Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id. Under both formulations, the party must

4

demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury" absent the issuance of the requested injunctive relief.[2]  Id.

**III. Discussion**

    A.   Likelihood of Success on the Merits

    Plaintiffs have demonstrated that they are likely to succeed on the merits of their UL listing-related claims.  The Settlement Agreement clearly states that the UL listings will be "maintained" in such manner "that Clark[] will have the benefit of them . . . ."  Blazeframe was very clear that it would retain those listings, and would not transfer them to CEMCO along with the patents.  Thus, notwithstanding Blazeframe's counsel's representation that "Blazeframe has no duties to ClarkDietrich whatsover," it appears beyond dispute that Blazeframe agreed to "maintain" the listings for Clark's use.

    Defendants' opposition does not dispute that Defendants threatened and intend to drop Clark from the current UL listing, and have no intention of including Clark in any re-testing, re-certification, or updated listing to UL's revised standards. Instead, Defendants argue that Plaintiffs are unlikely to succeed on the merits because (1) Clark is manufacturing defective products and (2) Clark has the resources to conduct its own product testing and obtain its own UL listings at its own expense.  These arguments are not persuasive.

---

[2] Even under the "serious interests" sliding scale test, a plaintiff must satisfy the four Winter factors and demonstrate "that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

5

First, Defendants raised the same manufacturing defect arguments in response to Plaintiffs' February 3 application for a TRO. Although not briefed or supported in comparable detail by either party in connection with the current application, Defendants essentially argue that Clark's packaging methods do not sufficiently protect the licensed products during transport. As discussed at the prior hearing, Plaintiffs dispute not only Defendants' characterization of Clark's products and packaging, but also Defendants' methods of evidence gathering and the authenticity of the samples examined by Defendants. The court need not resolve this evidentiary dispute, however, as there has been no significant change in the evidence or arguments since the time of the first hearing, at which Defendants agreed to leave Clark's UL designations undisturbed. Furthermore, Defendants' characterization does not appear to comport with the UL's own determination that Clark's products are sufficiently identical to Blazeframe's to merit UL certification.[3]

As for Defendants' suggestion that Clark can easily bear the expense of independent testing, and therefore obtain its own UL certification without Defendants' assistance, that contention is irrelevant. Whether Clark has the financial wherewithal to conduct its own testing has no bearing on the question whether Defendants agreed to maintain UL listings for Clark's benefit. The Settlement Agreement appears to leave little doubt that Blazeframe did so

---

[3] Even if Defendants' factual contentions are ultimately borne out, it is not clear to the court that defects in Clark's packaging would excuse Defendants from the obligations they agreed to undertake in the Settlement Agreement.

6

agree.  Plaintiffs have adequately shown, at this stage, that Defendants' renewed threats to drop Clark from the current UL listings and stated intent not to assist Clark in any way with respect to the revised testing requirements violate the Settlement Agreement.

     B.   Irreparable Harm

"Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." Advanced Transit Dynamics, Inc. v. Ridge Corp., No. CV 15-1877 BRO (MANx), 2015 WL 12516692 at *24 (C.D. Cal. Aug. 24, 2015) (quoting Celsis in Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012) (internal quotation marks omitted). There appears to be no dispute that, should Clark lose UL-certified status for Clark's licensed products, Clark will suffer severe damage to its reputation.  There is no dispute that architectural plans generally specify that only UL-certified components be used. Clark therefore faces the prospect of a drastically reduced, if not completely foreclosed, market, as well as the specter of wide-scale product returns and disputes over completed orders.  Furthermore, were Clark to lose the benefit of the UL listings, the pernicious reputational effects of being known as a seller of "unsafe" products would likely extend beyond the licensed products here to Clark's entire, varied line of building products.

Defendants nevertheless maintain that Clark would not be irreparably harmed in the absence of an injunction because Clark is free to conduct independent testing of its version of the licensed products and obtain its own UL listings at a cost of approximately $98,000. (Opposition at 20-21.)  As an initial matter, that

approach would, at best, only insulate Clark from irreparable harm at some point in the future. Defendants have, however, renewed their threat to drop Clark from even the current UL listings. Were Defendants to carry out that threat, no future independent certification would undo the harm that Clark would suffer from having lacked UL certification in the interim.

Furthermore, and even looking solely to Clark's ability to meet the revised UL standards come August, Defendant's narrow focus on the financial cost of independent testing significantly understates the challenges facing Clark. Defendants acknowledge that they have exclusive control over data files related to Blazeframe's testing of the licensed products to the current standard. Clark played no role in that testing, and enjoys UL certification only as a "multiple listee" under Blazeframe's certification. Thus, Clark has no information about the product configurations, methodology, or other testing circumstances that enabled Blazeframe to satisfy the UL's current requirements. Without Blazeframe's assistance, Clark might theoretically be able to start from scratch and design an adequate testing plan, obtain its own data, and satisfy the current UL standard. Only then it could it proceed to re-evaluate its products and procedures in light of the revised standard. It is undisputed, however, that any party hoping to obtain certification under the new standard must submit a testing plan to UL by May 31, 2017. It is extremely unlikely that Clark will be able to formulate and implement a testing regimen that would yield data and results roughly equivalent to that already in Klein's possession and then use that data to construct an even more stringent testing plan prior to UL's

8

May 31 and August deadlines. Clark would then face the same prospect of de-listing, with all of its concomitant, irreparable harms.[4]

C. Balance of Hardships and Public Interest

Defendants reiterate that Clark has greater financial resources than Blazeframe to argue that the balance of hardships favors the latter. These arguments ring hollow. As Plaintiffs point out, Blazeframe itself must conduct additional testing to satisfy UL's revised standards. It would cost Blazeframe no additional time, energy, or money to continue to designate Clark as a "multiple listee" of the Blazeframe listing. Nevertheless, and with an eye toward obviating future disputes of this nature, Clark proposed that it and Blazeframe collaborate to design and carry out new tests in light of the revised UL standards, with Clark bearing half of the cost of such testing and each party receiving a copy of the resulting data. Blazeframe rejected this proposal.[5]

Now, for the first time, Blazeframe asserts that it intends to completely abandon the licensed products at issue here, and suggests that it will not seek to maintain or update UL listings

---

[4] Furthermore, as discussed by this Court in a prior Order (Dkt. 106), Blazeframe may be judgment-proof, limiting the deterrent effect of money damages. See, e.g., Aviara Parkway Farms, Inc. v. Agropecuaria La Finca, S.P.R. de R.L., No. 08 CV 2301 JM (CAB), 2009 WL 249790 at *3 (S.D. Cal. Feb. 2, 2009); Wang Laboratories Inc. v. Chip Merchant Inc., No. 93-893-K (POR), 1993 WL 42820 at *7 (S.D. Cal. Sept. 3, 1993). Indeed, Defendants' course of conduct in this litigation appears to be somewhat untethered from increased risk of additional, significant monetary liability.

[5] As is evident from the discussion herein, and by the very number of motions filed in this case, Plaintiffs and Defendants are largely incapable of effective cooperation. The court is thus reluctant to order any relief requiring the parties to collaborate in good faith.

9

for the licensed products even for Blazeframe's own benefit.  That being the case, Clark asks that this court order Defendants to provide Clark with existing, UL testing-related data files, in order to afford Clark a realistic opportunity to develop and conduct its own tests and obtain its own UL listing within UL's looming deadlines.  Blazeframe, in response, contends that it would be inequitable to require it to turn over proprietary data to Clark.

As discussed above, it appears highly likely that Blazeframe bears the obligation to "maintain" UL listings for Clark's benefit, notwithstanding Defendants' stated position to the contrary. Defendant nevertheless argues that it would be unduly burdensome to (1) require Blazeframe to continue to list Clark as a multiple listee, at no additional cost to Blazeframe above its own testing costs, (2) require Blazeframe to bear even fifty percent of the cost of additional testing, or (3) share existing data already in Blazeframe's control.  In other words, Defendants not only refuse to take any affirmative action to themselves "maintain" the UL listings, but also contend that they should not be required to help Clark obtain its own listings.

Defendants cannot have it both ways.  As discussed above, Clark's "vast" financial resources do not insulate it from the significant hardships it faces as a result of Defendants' decisions.  Defendants have rejected any proposal that requires them to bear any testing costs whatsoever.  It would cost Blazeframe nothing, however, to share existing UL testing data with Clark.  Any hardship to Defendants, therefore, is negligible or, at

worst, remediable by money at a later date.[6] The balance of hardships weighs heavily in Plaintiffs' favor.

Nor is the court persuaded by Defendants' one-sentence argument that "the public interest sharply favors BlazeFrame because the risks associated with selling a life safety product that has never been fire tested is simply too great." (Opp. at 21.) This argument is predicated on the conclusion that Blazeframe's products and Clark's products are materially divergent. As discussed above, the evidence on record does not support any such conclusion at this stage, and this Court takes no position on the efficacy of any party's products. As noted above, however, UL itself appears to make no distinction between Blazeframe-manufactured products, which have been tested, and Clark-manufactured versions. UL remains free to grant or withhold its approval as it sees fit. The possibility that UL would deny its approval to Clark products, however, in no way justifies Defendants' efforts to impede Clark from maintaining or seeking it.

**IV. Conclusion**

For the reasons stated above, the court hereby orders that:

1. Defendants and their Agents are enjoined and prohibited from taking or engaging in any action or conduct that would cause, or is likely, or intended by Defendants, to cause, Clark to be removed from any listing of Underwriters Laboratory (UL) or any other third party certifying entity (collectively, "UL listings") for any

---

[6] Although Defendants refuse to turn over existing UL testing data to Clark, Defendants are willing to sell Clark that data.

|     |    |                                                                    |
| --- | -- | ------------------------------------------------------------------ |
| 1   |    | intumescent-tape bearing products or any fire stopping             |
| 2   |    | products; and                                                      |
| 4   | 2  | In the event Defendants or their Agents have taken any             |
| 5   |    | action or engaged in any conduct that would cause, or is           |
| 6   |    | likely, or intended by Defendants, to cause, Clark to be           |
| 7   |    | removed from any UL listings, Defendants are directed and          |
| 8   |    | ordered to immediately take all actions necessary to               |
| 9   |    | reinstate or maintain Clark's listing as approved on all           |
| 10  |    | UL listings for any intumescent-tape bearing products or           |
| 11  |    | any fire stopping products; and                                    |
| 13  | 3. | Defendants shall, by May 25, 2017, provide, or otherwise           |
| 14  |    | make available to ClarkDietrich, any and all UL files for          |
| 15  |    | licensed products, including testing and data files; and           |
| 17  | 4. | ClarkDietrich shall use such files and data for the sole           |
| 18  |    | purpose of obtaining its own UL certifications; and                |
| 20  | 5. | ClarkDietrich shall post a bond of $100,000 in connection          |
| 21  |    | with this Order.                                                   |

Failure to comply with this Order may result in sanctions, including the striking of the Answer and any Counterclaims, monetary sanctions, and imprisonment.

IT IS SO ORDERED.

Dated: May 23, 2017

DEAN D. PREGERSON
United States District Judge